ACCEPTED
12-15-00003-CR
TWELFTH COURT OF APPEALS
TYLER, TEXAS
10/30/2015 11:41:02 PM
Pam Estes
CLERK

Cause No. 12-15-00003-CR

In the Court of Appeals for the
Twelfth Judicial District at Tyler, Texas

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
10/30/2015 11:41:02 PM
PAM ESTES
Clerk

Dequisha Jackson,
Appellant

v.

State of Texas,
Appellee

On Appeal from Cause No.   2013-0731 in the 159th
Judicial District Court of Angelina County, Texas

**State's Brief**

April Ayers-Perez
Assistant District Attorney
Angelina County D.A.'s Office
P.O. Box 908
Lufkin, Texas 75902
(936) 632-5090 phone
(936) 637-2818 fax
State Bar No. 24090975
aperez@angelinacounty.net

**Oral Argument Not Requested**

## Identity of Parties and Counsel

Dequisha Jackson, Appellant
TDCJ Number: 01972267
Crain Unit
1401 State School Road
Gatesville, Texas 76599

John Tatum II.
Attorney for Appellant (trial)
P.O. Box 582
Lufkin, Texas 75902
SBN: 00789674

Katrina Carswell
District Attorney
Attorney for the State (trial)
Angelina County District Attorney's Office
P.O. Box 908
Lufkin, Texas 75902
SBN: 104822700

April Ayers-Perez
Assistant District Attorney
Attorney for the State (appeal)
Angelina County District Attorney's Office
P.O. Box 908
Lufkin, Texas 75902
SBN: 24090975

# Table of Contents

Identity of Parties and Counsel ................................................................. ii

Table of Contents ..................................................................................iii

Index of Authorities ............................................................................. iv

Statement Regarding Oral Argument........................................................... v

Issue Presented..................................................................................... v

Statement of Facts................................................................................. 1

Summary of the Argument ...................................................................... 10

Argument........................................................................................... 11

    **Reply Issue #1:** The evidence is legally sufficient to sustain the jury's guilty verdict for manslaughter . ......................................... 11

        Applicable law............................................................................ 11

        Standard of review..................................................................... 12

        The Actions and Inactions of the Appellant Rise to the Level of Reckless Conduct ....................................................... 13

        The Evidence Against the Appellant was More Compelling than the Evidence Against Isaiah Tolliver ............ 18

Prayer............................................................................................... 19

Certificate of Compliance...................................................................... 20

Certificate of Service.................................................................................20

# Index of Authorities

**Cases**                                                                                Page

*Brooks v. State*, 323 S.W.3d 839 (Tex.Crim.App. 2010) ...........................12

*Clayton v. State*, 235 S.W.3d 772 (Tex.Crim.App. 2007) .........................12

*Hooper v. State*, 214 S.W.3d 9 (Tex.Crim.App. 2007)...............................12

*Jackson v. Virginia*, 443 U.S. 307 (1979) ...........................................12, 13

*Kitchens v. State*, 823 S.W.2d 256 (Tex.Crim.App. 1991).........................13

*Paulson v. State*, 570 S.W.3d 570 (Tex.Crim.App. 2000).........................13

*Temple v. State*, 390 F.3d 341 (Tex.Crim.App. 2013) ........................12, 13

**Rules**

Tex. R. App. P. 9.4(i)(1) ...........................................................................20

Tex. R. App. P. 39.1 ................................................................................. v

**Statutes**

Tex. Pen. Code Ann. § 19.04(a) (West 2011) ...........................................11

Tex. Pen. Code Ann. § 6.03(c) (West 2011) .............................................11

## Statement Regarding Oral Argument

Pursuant to Tex. R. App. P. 39.1, the State feels oral argument is unnecessary, as the facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument.

## Issue Presented

**Reply Issue #1:** The evidence is legally sufficient to sustain the jury's guilty verdict for Manslaughter.

**Statement of Facts**

On August 13, 2013 Imauri Jackson was born to Dequisha Jackson and Isaiah Tolliver at Methodist Hospital in Baytown, Texas.[1] Jackson received discharge instructions from Methodist Hospital stating that she was supposed to follow up with a physician three days after discharge for Imauri.[2] An appointment for Imauri was made for August 19, 2013.[3] Jackson never showed up for the appointment with Imauri, nor did anybody ever take Imauri to a physician again until his death on October 11, 2013.[4] On August 28, 2013 Jackson, Tolliver, and baby Imauri moved to Lufkin, Texas, in Angelina County, to live with Linda Bankhead, Jackson's Aunt at 1506 Williams Street.[5]

On October 11, 2013 Desmond Garcia, a paramedic with the city of Lufkin, Texas, responded to a call of an infant not breathing at 1506 Williams Street.[6] Garcia's unit was the first on the scene,[7] and it took about six to seven minutes for Garcia's unit to arrive on scene after receiving the

---

[1] VI R.R. at 110.
[2] *Id.* at 111.
[3] *Id.* at 112.
[4] *Id.*
[5] *Id.* at 109.
[6] V R.R. at 38-41.
[7] *Id.* at 41.

1

911 call.[8]  Upon entering the house Garcia went to the right into a bedroom where an infant, Imauri Jackson, was lying on the floor on its back, while the Appellant, Dequisha Jackson, was sitting on the bed, and her co-defendant, Isaiah Tolliver, was pacing.[9]  Garcia noted that Jackson and Tolliver were not behaving as typically parents behave during these situations based on his experience.[10]  Garcia said, in his experience, parents are more irate and distraught than anything he saw from Jackson and Tolliver, whereas, in this instance, Jackson and Tolliver were not acting as if this was an emergency.[11]  The first thing Garcia did was to pick Imauri up, who was already in cardiac arrest and stiff, and began resuscitation efforts including attempting to get intravenous access, establish the airway, and push medications through.[12]  One of Garcia's first thoughts was that Imauri was a preemie, or premature, because of its size.[13]  After checking Imauri's  pulse, and finding none, and noting Imauri was blue and cold to the touch, Garcia's partner, Dillon Millender, scooped Imauri up and ran to the ambulance with him.[14]  Garcia and his unit were only at the residence

---

[8] *Id.* at 50.
[9] *Id.* at 43.
[10] *Id.* at 43-44.
[11] *Id.* at 44, 52.
[12] *Id.* at 46.
[13] *Id.* at 47.
[14] *Id.* at 47-48.

for two to three minutes.[15]  After arriving at the hospital, Woodland Heights, Garcia transferred care to the nurses and stayed at the hospital for 35-40 minutes to check on the status of baby Imauri.[16]  It took a total of approximately ten to twelve minutes to arrive in the hospital's emergency room.[17]

After Garcia and his unit left with Imauri, Jarrod Hennigan, a patrol officer with the Lufkin Police Department, was one of the first officers to arrive on scene at 1506 Williams Street.[18]  One of the first people Officer Hennigan spoke to was Linda Bankhead, who was nonchalant and stated that she did not know much, except that Jackson woke her up to tell her the baby was not breathing, and Bankhead called 911.[19]  After learning of the Imauri's death, Hennigan, along with Debra Walsh, a crime scene technician, walked around the house taking photographs.[20]  In the bedroom where Jackson, Tolliver, and Imauri were staying the baby carrier, which had a lot of blankets and pillows, looked as though it was being used as a bed for Imauri.[21]  In the room Imauri was staying in there were no baby

---

[15] *Id.* at 50.
[16] *Id.* at 48-49.
[17] *Id.* at 50.
[18] *Id.* at 57-58.
[19] *Id.* at 63.
[20] *Id.* at 64-65.
[21] *Id.* at 76-77.

supplies, diapers, supplies of diapers, and only one used diaper in the trash can.[22] In the closet in the bedroom Officer Hennigan found one new diaper as well as some diaper wipes.[23] There were five cans of formula on top of the refrigerator, as well as some cereal, and no other formula found in the house.[24] Also in the kitchen Officer Hennigan located some sippy cups, commonly used by older children.[25] Officer Hennigan noted that another Officer, Offficer Brooks, looked through the city trash can that was outside the house for dirty diapers, and because Officer Brooks did not take any photographs it was assumed no dirty diapers were found in the trash can.[26]

Linda Bankhead, the aunt of Jackson, and the renter of the two-bedroom house at 1506 Williams Street, stated that, in addition to Jackson, Tolliver, and Imauri, Bankhead's children –Robert, age 26, Zyron, Chyrieka, age 20, and Zyron, age 16, all lived at the house as well.[27] During the month Jackson, Tolliver, and Imauri were living with Bankhead, Bankhead had only held Imauri once and had never changed his diaper, given him a bath, or fed him.[28]

---

[22] *Id.* at 77-79.
[23] *Id.* at 80-81.
[24] *Id.* at 81-84.
[25] *Id.* at 95-98.
[26] *Id.* at 101-03.
[27] *Id.* at 120-21.
[28] *Id.* at 124-25.

Bankhead stated that Jackson would fix bottles for Imauri, with cereal in them, though, when pressed, Bankhead could not remember if she had ever actually seen Jackson do this.[29] Due to the appearance of Imauri, Bankhead told Jackson she needed to take Imauri to a doctor.[30] Bankhead further noted that the weight of Imauri alarmed her, even going so far as to ask Jackson if the two month old baby Imauri was a preemie.[31] Jackson had an appointment for the baby for October 14, 2013.[32] Bankhead bought formula for Imauri once, but never bought diapers or bottles.[33] Bankhead had encouraged Jackson, and shown her, how to sign up for WIC.[34] Bankhead told Nick Malone with the Lufkin Police Department that upon touching Imauri before calling 911 Imauri was stiff and cold.[35]

Only two physicians offices in Lufkin saw children with medicare, Dr. Andrew Fercowitz and Angelina Pediatrics.[36] The Custodian of Records for Dr. Fercowitz, Donna Bailey, did not have any record of Imauri Jackson.[37] Sharon Shaw, the Custodian of Records for the Health District of Angelina

---

[29] *Id.* at 128-29.
[30] *Id.* at 132.
[31] *Id.* at 157, 161.
[32] *Id.* at 134.
[33] *Id.* at 140-41.
[34] *Id.* at 144-46.
[35] VI R.R. at 107.
[36] V R.R. at 191-92, 216-17.
[37] *Id.* at 193.

County, testified that it was on October 4, 2013 that Jackson requested her WIC be transferred from Liberty County, and that Imauri was never in the system up until October 4, 2013.[38] However, after Imauri's death, it was discovered that Jackson had Medicaid and thus Imauri was covered as well.[39]

Dr. Melissa Handley, a pediatrician, was the on call pediatrician for the hospital when Imauri was brought in as a cardiorespiratory emergency.[40] It took five minutes for Dr. Handley to arrive at the hospital after being paged.[41] When Dr. Handley arrived the Emergency Room Physician, Dr. Monroe, had begun resuscitation on Imauri.[42] Imauri also had two intravenous lines put in his leg, been given three runs of epinephrine, and given fluid boluses to support Imauri and had received no response.[43] Imauri was in asystole and had no cardiac electrical activity since his arrival.[44] Imauri arrived at the hospital with no heartbeat and his

---

[38] *Id.* at 197-98.
[39] VI R.R. at 42-43.
[40] V R.R. at 219.
[41] *Id.* at 220.
[42] *Id.*
[43] *Id.*
[44] *Id.* at 220-21.

temperature was 94.7, well below the average for a baby Imauri's age of 99.5.[45] Dr. Handley noted Imauri did not look healthy:

> The most dramatic thing is that he was just emaciated. He looked – he was -- he did not look like a healthy two-month-old. He had – his skeletal, you could easily see his ribs. He didn't have a lot of the subcutaneous fat that a normal two-month-old baby would have, the chubby cheeks, the thick neck, the pudgy arms. He didn't have any of that. He was emaciated.[46]

Dr. Handley continued resuscitation efforts for 25 minutes with no response from Imauri, before pronouncing Imauri dead at 10:40 a.m.[47] Imauri was very stuff and his pupils were fixed and dilated by the time he arrived at the hospital, and he was already in rigor mortis.[48] Imauri weighed five pounds six ounces when he died on October 11, 2013, whereas his weight should have been around nine and a half pounds[49] Imauri weighed six pounds six ounces two months earlier when he was born.[50] Dr. Handley further noted that Imauri's fontanel was sunken, which is consistent with dehydration, and is something that occurs late in time from dehydration, occurring only after the body is more than 10% dehydrated.[51]

---

[45] *Id.* at 221-22.
[46] *Id.* at 222.
[47] *Id.* at 222-23.
[48] *Id.* at 223, 229.
[49] *Id.* at 227, 267.
[50] VI R.R. at 68.
[51] V R.R. at 250-51.

After Dr. Handley was informed of the timeline of events, based on Jackson's information to emergency responders, she was concerned because the fact that Imauri was in rigor mortis, which does not occur until three to eight hours after death, did not fit the timeline Jackson was providing.[52] The timeline given to Dr. Handley was that Jackson and Tolliver were handling Imauri for about fifteen minutes until he stopped breathing, it took five minutes for the ambulance to get to the house, it took ten minutes for the ambulance to get to the hospital, and when Dr. Handley saw Imauri right after he arrived he was already in rigor mortis.[53] Dr. Handley said the timeline was not correct because Imauri died sooner than what Jackson was claiming.[54] Further, when rigor mortis set in, Imauri was lying flat, not in the car seat like the story that had been told to the EMT.[55] Imauri also had blanching, which is where everything stays in place after the time of death.[56] Essentially, whatever part of the body pressed up against a surface will not refill with blood when moved because there is no

---

[52] *Id.* at 232.
[53] *Id.*
[54] *Id.* at 233.
[55] *Id.* at 233-34.
[56] VI R.R. at 38.

more blood pressure.[57]   Blanching does not occur until eight to twelve hours after death, and was just starting to occur to Imauri.[58]

Dr. Handley noted that all emergency room instructions are virtually the same, that babies are going to eat one to three ounces every two to four hours.[59]   Dr. Handley noted that Jackson would have received discharge papers stating that when she left the hospital with Imauri.[60]  Dr. Handley also noted that the fact that Jackson received paperwork telling her to take Imauri to a Dr. within three days after discharge also would have been normal.[61]

On October 12, 2013 Dr. Candace Schoppe of the Dallas County Medical Examiner's Office performed an autopsy on Imauri Jackson.[62]  Her initial notes on Imauri's condition were:

> "There were no – he had no external injuries.  The major findings were just his extreme emaciation.  The muscles on [his] temporals, they're wasted.  The fat pads in [his] cheeks were almost depleted. You could see his ribs through his skin.  There was almost no fat in the skin – underlying the ribs.
> The skin had what we call decreased turgor.  So when somebody gets really dehydrated with you, an example, if you kind of pinch their skin, it sticks.  It doesn't just flatted back out.  And his skin did that.

---

[57] *Id.* at 39.
[58] *Id.* at 36-37.
[59] V R.R. at 235-36.
[60] *Id.* at 236.
[61] *Id.* at 246.
[62] VI R.R. at 63, 66-67.

He also had a green discoloration of his abdomen. He didn't have much residual rigor mortis. So he wasn't very stiff anymore. His eyes had clouded over, and he had fixed lividity on his back."[63]

Dr. Schoppe also noted that many of the organs of Imauri, including his liver, stomach, and skull, were showing signs of malnutrition and dehydration.[64] Further, Imauri had a heightened level of cortisol, which is a sign of stress in an infant caused by dehydration and malnutrition.[65] Despite a myriad of tests Dr. Schoppe found no diseases or conditions that Imauri had that would explain any sort of malnutrition or dehydration.[66]

While in the Angelina County Jail, Jackson told Misti Davis, a fellow inmate, that when Imauri would cry Jackson would just give him a pacifier instead of feeding him.[67] Jackson also told Davis that Tolliver would never change Imauri's diaper or feed Imauri.[68]

## Summary of the Argument

Dequisha Jackson had little regard for her son, Imauri Jackson. She purposefully withheld food, telling a future inmate that when two month old Imauri would cry for food she would put a pacifier in his mouth to make him

---

[63] *Id.* at 68-69.
[64] *Id.* at 80-82.
[65] *Id.* at 83-84.
[66] *Id.* at 84-86.
[67] *Id.* at 133.
[68] *Id.* at 135.

stop.  Jackson ignored discharge instructions from the hospital after giving birth, refused to take Imauri to the Dr., and let him waste away before dying from malnutrition and dehydration.

Jackson, not Isaiah Tolliver, was the person primarily responsible for Imauri's care, and the person ultimately more culpable for Imauri's demise.

**Argument**

**Reply Issue #1:**  The evidence is legally sufficient to sustain the jury's guilty verdict for Manslaughter.

*Applicable law*

A person commits the offense of manslaughter if [s]he recklessly causes the death of an individual.[69]

A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.[70]

---

[69] Tex. Pen. Code Ann. §19.04 (a) (West 2011).
[70] Tex. Pen. Code Ann. §6.03(c) (West 2011).

*Standard of review*

The State must prove every element of the crime charged beyond a reasonable doubt.[71] In reviewing the legal sufficiency of the evidence in support of a conviction, the court considers the evidence in the light most favorable to the verdict to determine whether – based on evidence and reasonable inferences – the jury was rationally justified in finding guilt beyond a reasonable doubt.[72] The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses.[73] Although the court allows juries to draw multiple inferences from facts, as long as those facts are supported by evidence presented at the trial, the jury is not allowed to draw conclusions based upon speculation, because in doing so the jury would not be supporting a finding of beyond a reasonable doubt.[74] The definition of "beyond a reasonable doubt", and "reasonable

---

[71] *Jackson v. Virginia*, 443 U.S. 307, 313-14 (1979).
[72] *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (*citing Jackson*, 443 U.S. at 318-19 & *Brooks v. State*, 323 S.W.3d 839, 912 (Tex. Crim. App. 2010)); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).
[73] *Id.*
[74] *Id.*

doubt" itself are left to the jury, and the trial court is discouraged from defining it for the jury.[75]

A criminal case may, however, be based solely upon circumstantial evidence, and that circumstantial evidence can be sufficient by itself to support a verdict of guilt beyond a reasonable doubt.[76] In circumstantial cases not every fact and circumstance needs to point "directly and independently to the defendant's guilt."[77]

### *The Actions and Inactions of the Appellant Rise to the Level of Reckless Conduct*

The actions, and inactions, of Jackson are beyond the level of just criminally negligent, and rose to the level of reckless, thus making Jackson guilty of manslaughter, not just endangering a child. The State alleged, in its indictment, that Jackson committed the reckless conduct one of three separate ways: providing inadequate nutrition, providing inadequate fluids, or providing inadequate medical care. As long as there is evidence to support any one of the acts as reckless as alleged in the indictment the verdict is sufficient.[78]

---

[75] *Paulson v. State*, 570 S.W.3d 570, 573 (Tex. Crim. App. 2000)
[76] *Temple*, 390 S.W.3d at 359.
[77] *Id.*
[78] *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).

Dequisha Jackson did not behave like a mother who had just lost her child, and this was the first sign of consciousness of guilt for those who saw Jackson's reactions or lack of reactions. Desmond Garcia, the EMT who first arrived on scene, noted that Jackson was not behaving typically: "Typically – mothers, in particular, tend to be more irate, screaming, you know. You know, just really irate, screaming and hollering, walking around with their baby. Usually the mother has the baby in their hands. Most of them, they're holding the baby. You basically have to pry the baby out of the mom's arms pretty much."[79] Officer Malone also saw the lack of empathy: "Both parents had significantly less grief than what you would expect and didn't seem near as sad and upset as parents in other cases of child deaths that I've been involved with."[80] Only one clean diaper was found in the house Imauri was living in with Jackson and Tolliver, only two bottles were found that were sufficient for Imauri to use, and only about a weeks worth of formula was found, in all different brands.[81]

Despite Imauri's very visible emaciation[82], Jackson never once took Imauri to a Doctor, to a hospital, or any type of facility.[83] In fact, despite

[79] V R.R. at 51.
[80] VI R.R. at 104.
[81] V R.R. at 77-79, 81-84, & 95-98.
[82] *See* State's Exhibits 39-43.
[83] VI R.R. at 111.

14

hospital discharge instructions telling Jackson to take Imauri to a physician within three days, Jackson made an appointment and never showed up.[84] Meanwhile, Imauri lost over a pound from his birth weight until his untimely death at two months old, and this still did not concern Jackson enough to take Imauri to a doctor.[85] Further, after Imauri's death, Jackson admitted that she would just put a pacifier in Imauri's mouth instead of feeding him.[86] Jackson's concern was not Imauri, her concern was her boyfriend, Isaiah Tolliver.[87]

Linda Bankhead, Jackson's Aunt and the person Jackson, Tolliver, and Imauri were living with, did her best to try to defend Jackson. However, when asked if she actually saw Jackson feed Imauri Bankhead repeatedly struggled to answer that question, just saying she knew Imauri was fed.[88] Bankhead initially told Officer Malone that Imauri was cold to the touch and stiff when she initially touched him[89], however at trial Bankhead changed her mind and decided that Imauri was actually warm when she touched him.[90] Bankhead had more inconsistencies in her statement, which largely

---

[84] *Id.* at 112.
[85] V R.R. at 227.
[86] VI R.R. at 133.
[87] *Id.* at 138.
[88] V R.R. at 127-29.
[89] VI R.R. at 107.
[90] V R.R. at 147.

15

was positive toward Jackson, when Bankhead claimed Imauri was on the bed[91] however Garcia saw Imauri on the floor[92], and levidity prove Imauri was on a flat surface, not the bed[93]. Despite Bankhead's best efforts to defendant Jackson, even she was concerned, as best as she could be, with Imauri, trying to convince Jackson to get on WIC, to make an appointment with a physician, and even making a comment on the day of Imauri's death that "I told them they need to get the baby checked out… I told them something was wrong with the baby. The baby needed to be checked out".[94]

One of the biggest signs of evidence the jury heard was the picture of Imauri at the time of his death, emaciated, and the reactions from all the first responders to the condition of Imauri. It started with Desmond Garcia, the EMT from Lufkin and one of the first responders, who said Imauri "was blue in color, and he was cold to touch, and he was visibly malnourished. You could see his ribs, cheekbones. His jaw – his cheeks were sunken in. He looked like an older person, like a geriatric, you know, kind of."[95] Next Dr. Handley saw Imauri and she, too, was surprised and shocked by the

---

[91] V R.R. at 148.
[92] *Id.* at 221.
[93] VI R.R. at 36.
[94] V R.R. at 45.
[95] *Id.* at 46.

appearance of this two month old: "The most dramatic thing is that he was just emaciated. He looked – he was – he did not look like a healthy two-month-old. He had – his skeletal, you could easily see his ribs. He didn't have a lot of the subcutaneous fat that a normal two-month-old baby would have, the chubby cheeks, the thick neck, the pudgy arms. He didn't' have any of that. He was emaciated."[96] The next day, October 12, 2013, when Dr. Schoppe performed the autopsy on baby Imarui, she too was shocked by his appearance: "There were no – he had no external injuries. The major findings were just his extreme emaciation."[97] Finally Officer Malone of the Lufkin Police Department also observed Imauri: "I had never seen anything like it. You know, it was obviously a young infant, and you could see the majority of his bone and skeletal structure. I don't know how else to describe it, just a child who was very under weight." A picture of Imauri at the time of his death shows just how dramatic, and obvious, his condition was.[98]

When all of the evidence is added up, particularly Jackson's lack of remorse or grief, Bankhead's inconsistencies coupled with her claim that Jackson fed Imauri, Jackson's not appearing at a doctor's appointment for

---

[96] *Id.* at 222.
[97] VI R.R. at 68.
[98] C.R., *See* State's Exhibit 39-43.

Imauri and never taking Imauri to a doctor in his two months alive, Jackson's own admission to Misti Davis that she did not feed Imauri and instead just gave him a pacifier when he was hungry, combined with the sheer horror of the image of an emaciated Imauri, the overwhelming evidence points to reckless behavior on the behalf of Jackson, and in a light most favorable to the jury's verdict of guilt for manslaughter, the evidence is sufficient to support that.

### The Evidence Against the Appellant was More Compelling than the Evidence Against Isaiah Tolliver

By her own admission, it was Dequisha Jackson who was home with Imauri during the day, not Isaiah Tolliver for the most part. The evidence points toward more culpable actions and inactions out of Jackson than Tolliver, thus the jury's guilty verdict of manslaughter for Jackson and endangerment of a child for Tolliver is correct and the totality of the evidence was not substantially similar between Jackson and Tolliver.

When Dequisha Jackson left Methodist Hospital in Baytown, Texas she received discharge instructions on how to care for Imauri, and to bring Imauri to a physician within three days.[99] Jackson not only did not follow the instructions she was aware she had, she did not ever take Imauri to a

---

[99] VI R.R. at 112.

physician, despite claiming to others that she had.[100]  It was Jackson, not Tolliver, who was home all day with Imauri, and in charge of feeding Imauri while home.  Tolliver was out during the day looking for a job, and once Tolliver began working for Pilgrim's Pride, he was gone all night while Jackson was in charge of Imauri's care.[101]  Furthermore, Jackson was the one who told Misti Davis she would just put a pacifier in Imauri's mouth, rather than feed him.[102]  Jackson also apologized to Tolliver for putting him in this position.[103]

Jackson was always at the center of all of the malnutrition and dehydration problems baby Imauri had.  Between Jackson's own admissions, coupled with Jackson's time with Imauri being so much greater than Tolliver's time with Imauri, the totality of the evidence was not similar between Jackson and Tolliver, and thus a guilty verdict on endangering a child, and not manslaughter, for Tolliver should have no impact on the guilty verdict of manslaughter for Jackson.

## Prayer

The State of Texas prays that this Court of Appeals affirm the judgment of the trial court.

---

[100] VII R.R. at 52.
[101] *Id.* at 69.
[102] VI R.R. at 133.
[103] VII R.R. at 100.

Respectfully Submitted,

/s/ April Ayers-Perez
Assistant District Attorney
Angelina County D.A.'s Office
P.O. Box 908
Lufkin, Texas 75902
(936) 632-5090 phone
(936) 637-2818 fax
State Bar No. 24090975
ATTORNEY FOR THE
STATE OF TEXAS

## Certificate of Compliance

I certify that this document contains 4,033 words, counting all parts of the document except those excluded by Tex. R. App. P. 9.4(i)(1). The body text is in 14 point font, and the footnote text is in 12 point font.

/s/ April Ayers-Perez

## Certificate of Service

I certify that on October 30, 2015, a true and correct copy of the above document has been forwarded to John Reeves, 1007 Grant Ave., Lufkin, TX 75901, by electronic service through efile.txcourts.gov.

/s/ April Ayers-Perez